## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| RICHARD GRISAFI, on behalf of himself and the Putative Class, | |
| *Plaintiffs*, | Civil Action No. 18-8494 (JMV) (JBC) |
| v. | **OPINION** |
| SONY ELECTRONICS INC., | |
| *Defendants*. | |

**John Michael Vazquez, U.S.D.J.**

This putative class action concerns a software update that intentionally rendered a personal internet viewing device, the Sony Dash, nonfunctional. D.E. 1. Plaintiff alleges eight counts against Defendant Sony Electronics Inc. ("Sony") relating to the software update: (I) violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.*; (II) violation of the New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. § 56:8-2 *et seq.*; (III) breach of express warranty; (IV) breach of implied warranty; (V) violation of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 230 *et seq.*; (VI) violation of the New Jersey Truth in Consumer Contract, Warranty, and Notice Act ("TCCWNA"), N.J.S.A. § 56:12-15 *et seq.*; (VII) trespass to chattels; and (VIII) unjust enrichment. *Id.* Currently pending before this Court is Defendant's motion to dismiss Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. D.E. 15. The

Court reviewed the parties' submissions in support and in opposition,[1] and considered the motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons stated below, Defendant's motion to dismiss is denied in part and granted in part.

## I. INTRODUCTION[2]

Sony released the Dash in 2010 and described it as a "personal application viewer" featuring "built-in Wi-Fi, stereo speakers, a USB port, and a 7-inch touch screen." Compl. ¶ 17. A senior vice president with Sony explained that the Dash "empower[ed] consumers with a fun, interactive way to stay connected with their news, entertainment, interests and ultimately, their lives." *Id.* ¶ 18. The Dash supported over 1,000 free applications, including those that allow access to Facebook, YouTube, Pandora, Flickr, Netflix, and more. *Id.* ¶¶ 18, 21, 22, 25. The Dash came with a one-year limited warranty for hardware repair or replacement. *Id.* ¶ 74. As for software, consumers accepted Sony's End User License Agreement ("EULA") by using the product, which stated in pertinent part:

> From time to time, Sony . . . may automatically update or otherwise modify the Software, for example, but not limited to for purposes of error connection, improvement of features, and enhancement of security features. Such updates or modifications may change or delete the nature of features or other aspects of the Software, including but not limited to features you may rely upon. You hereby

---

[1] Defendant's brief in support of its motion will be referred to as "Def. Br.," D.E. 15-1; Plaintiff's opposition will be referred to as "Pl. Opp'n," D.E. 19; Defendant's reply will be referred to as "Def. Reply," D.E. 22.

[2] The facts are derived from Plaintiff's Complaint ("Compl."), D.E. 1, and documents relied upon therein. When reviewing a motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). A court may also consider any document integral to or relied upon in the complaint and matters of public record. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997); *see also In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 368 (3d Cir. 1993) ("a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.").

> agree that such updates and modifications may occur at Sony's sole
> discretion, and that Sony may condition continued use of the
> Software upon your complete installation or acceptance of such
> updates or modifications.

*Id.* ¶ 27, Ex. A. Plaintiff alleges that the EULA came inside of the Dash packaging, therefore the

EULA could only be viewed once the consumer "purchase[d] the Dash, br[ought] it home[,] and

t[ook] it out of the box." *Id.* ¶ 27.

Plaintiff purchased five Dashes. *Id.* ¶¶ 30-34. On July 20, 2011 he purchased two HID-

C10 Dashes (the original model) from Amazon.com for $104.96 each. *Id.* ¶¶ 30-32. He later

purchased an additional HID-C10 Dash because of how pleased he was with the product. *Id.* ¶ 33.

Less than a year later, he purchased an HID-B70 Dash (an updated model that featured a backup

battery) from Woot.com for $79.99, and subsequently purchased a final HID-B70 Dash from

eBay.[3] *Id.* ¶ 34.

In July 2017, Sony released a software update,[4] version 1.7.1604 (the "Update"). *Id.* ¶ 28.

On July 12, a pop-up appeared on Plaintiff's HID-C10 Dashes indicating that the Update was

available for download. *Id.* ¶ 37. Plaintiff was unable to opt out of the Update. Instead, he had to

press "OK," which allowed the device to download the Update, in order to continue using the

device. *Id.* ¶¶ 28, 37. When the Update completed, the device restarted to a screen that reads

"SONY," with the "SONY" light flashing at the bottom. *Id.* ¶ 37. Plaintiff alleges and Defendants

do not deny that this is the intended – and *only* – capability of the HID-C10 Dash post-Update. *Id.*

---

[3] In his Complaint, Plaintiff does not include dates or prices for the purchases other than those
stated.

[4] Plaintiff uses the terms firmware update and software update interchangeably in his Complaint.
*See* Compl. ¶ 59 ("[t]he firmware/software update SONY intentionally transmitted to the SONY
Dash caused damage to it, resulting in a bricked product.").

Given that the Update rendered the device nonfunctional,[5] Plaintiff alleges that Sony "bricked" the Dash. *Id.* Plaintiff explains that "bricking" refers to a software update that renders the hardware "useless." *Id.* ¶ 3 n. 1 (citation omitted).

Plaintiff filed his Complaint on April 27, 2018, alleging the eight counts mentioned above. Compl. ¶¶ 53-127. Defendant moved to dismiss on July 27, 2018 pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. D.E. 15. Plaintiff opposed the motion, D.E. 19, and Defendant replied, D.E. 22.

## II. LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a count for "failure to state a claim upon which relief can be granted[.]" To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint is plausible on its face when there is enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims." *Id.* at 789.

In evaluating the sufficiency of a complaint, a district court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.

---

[5] Plaintiff notes that since his HID-B70 Dash models run on backup battery power, they still have been able to function as "a passive alarm clock" but once their batteries drain, they too will be bricked from the update. *Id.* ¶ 38.

*Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). A court, however, is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007). If, after viewing the allegations in the complaint most favorable to the plaintiff, it appears that no relief could be granted under any set of facts consistent with the allegations, a court may dismiss the complaint for failure to state a claim. *DeFazio v. Leading Edge Recovery Sols.*, 2010 WL 5146765, at *1 (D.N.J. Dec. 13, 2010).

"Independent of the standard applicable to Rule 12(b)(6) motions, Rule 9(b) imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). Thus, pursuant to Rule 9(b), when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake . . . [m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). A party alleging fraud must therefore support its allegations with factual details such as "the who, what, when, where and how of the events at issue." *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016). Accordingly, "[t]o satisfy the particularity standard, 'the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation.'" *Feingold v. Graff*, 516 F. App'x 223, 226 (3d Cir. 2013) (citing *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)). This heightened pleading standard is designed to "ensure that defendants are placed on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of fraud." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (internal quotation marks omitted).

## III. ANALYSIS

CFAA (Count I)

Plaintiff first alleges a violation of the CFAA. Compl. ¶¶ 53-60. The CFAA provides that

a defendant is liable for "knowingly caus[ing] the transmission of a program, information, code,

or command, and as a result of such conduct, intentionally caus[ing] damage without authorization,

to a protected computer." *In re Apple & AT & TM Antitrust Litig.*, 596 F. Supp. 2d 1288, 1308

(N.D. Cal. 2008) ("*In re Apple*") (quoting 18 U.S.C. § 1030(a)(5)(A)(i)). "A plaintiff must also

demonstrate that the defendant's action caused over $5,000 in damage over a one-year period." *Id.*

(citing 18 U.S.C. § 1030(a)(5)(B)).

Defendant first argues that Plaintiff failed to plausibly allege that the Dash is a "protected

computer" within the meaning of the statute. Def. Br. at 13; Def. Reply at 2-3. The CFAA defines

a protected computer as an "electronic . . . or other high speed data processing device . . . which is

used in or affecting interstate or foreign commerce or communication[.]" 18 U.S.C. §§ 1030(e)(1),

(e)(2)(B). Here, Plaintiff alleges that the Dash was a "personal application viewer" featuring

> 1,500+ apps available to deliver weather, traffic, social networking,
> movies, music, and more[;] 7-inch touchscreen with gesture support
> and WVGA [Wide Video Graphics Array] (800x480) pixel
> resolution[;] 802.11b/g Wi-Fi to easily connect to your wireless
> home network[;] 500Mhz processor with 32kB I/D L2 cache
> [storage]; [and] 256 MB, 667MHz DDR2 DRAM [memory].

*Id.* ¶¶ 17-19. Plaintiff therefore plausibly pled that the Dash is a "high speed processing device,"

or a "computer." Further, Plaintiff sufficiently alleges that the Dash is a "protected computer"

because it uses the Internet to engage in interstate communication, accessing over 1,500

applications that deliver a wide variety of information stemming from various locations. *Id.* ¶¶

17-19; *see United States v. Trotter*, 478 F.3d 918, 921 (8th Cir. 2007) (finding that a computer

connected to, and used to access, the Internet is a "protected computer" under the CFAA); *United*

*States v. Roque*, No. 12-540, 2013 WL 2474686, at *2 (D.N.J. June 6, 2013) (finding the same).

Plaintiff plausibly pled that the Dash is a "protected computer" within the meaning of the CFAA.

Defendant next asserts that the Update was not "without authorization" given the language of the EULA. Def. Br. at 14-15; Def. Reply at 3-6. Specifically, Defendant argues that the "EULA authorizes Sony to 'modify' the Software at any time, and warns that such modifications 'may change or delete the nature of features or other aspects of the Software, including but not limited to the features [the consumer] may rely upon.'" Def. Br. at 14 (quoting the EULA). A similar argument was addressed in *In re Apple*, 596 F. Supp. 2d at 1308. In that case, Apple, the defendant, relied on the following language to argue that it acted "with authorization" for purposes of the CFAA when bricking iPhones that has been "unlocked" to access third-party applications: "IF YOU HAVE MODIFIED YOUR IPHONE'S SOFTWARE, APPLYING THIS SOFTWARE UPDATE MAY RESULT IN YOUR IPHONE BECOMING PERMANENTLY INOPERABLE." *Id.* at 1296, 1307. The district court concluded that usage of the term "may" (as in "may result" in damage) created too much "ambiguity surrounding Apple's warning" and found the plaintiff's allegations as to its CFAA claim sufficient to defeat Apple's motion to dismiss. *Id.* at 1307.

Here, Sony used the same ambiguous "may" (as in "may change or delete the nature of features") and even more uncertain language than in *In re Apple*. Unlike in *In re Apple*, Sony did not explicitly warn that a subsequent software update could render the Dash "permanently inoperable." The EULA does not say that Sony can delete *all* features. Instead, it vaguely warns consumers that Sony "*may* change or delete the nature of features" that a consumer "*may* rely upon." Def. Br. at 14 (emphasis added); Compl. ¶ 27, Ex. A (emphasis added). This sentence is also prefaced by the following: "From time to time, Sony . . . may automatically update or otherwise modify the Software, for example, but not limited to for purposes of error connection,

improvement of features, and enhancement of security features." Compl. ¶ 27, Ex. A. This preface

implies that automatic software updates will *improve* or *enhance* the Dash – not destroy its

functionality. The Court cannot say at this stage in the proceedings that by using the Dash and

thus implicitly agreeing to the EULA, Plaintiff authorized Sony to render his Dashes inoperable.

Plaintiff plausibly pled that Sony acted "without authorization" in bricking the Dash.

Defendant next argues that Plaintiff has not plausibly pled the CFAA loss threshold of

$5,000. Def. Br. at 15-16; Def. Reply at 6-10. Defendant argues that Plaintiff paid $289.91 total

for three of his Dashes and fails to state how much he paid for the other two Dashes. Def. Br. at

15 n.11 (citing Compl. ¶¶ 30-34). The Court agrees that Plaintiff failed to plausibly establish that

he meets the $5,000 on his own. However, Plaintiff argues that the loss requirement is not limited

to his losses but can be aggregated over all United States consumers whose Dashes were bricked

by Sony's Update (his purported class). Pl. Opp'n at 24.

*In re Am. Online, Inc.*, 168 F. Supp. 2d 1359 (S.D. Fla. 2001), the court addressed this

aggregation issue and analyzed the legislative history behind the CFAA. The district court quoted

the Senate Report to the 1986 amendments to the CFAA, which stated that

> [t]he Committee does not intend that every victim of acts proscribed
> under (a)(5) must individually suffer a loss of $1,000.[6] Certain types
> of malicious mischief may cause smaller amounts of damage to
> numerous individuals, and thereby collectively create a loss of more
> than $1,000. By using "one or more others," the Committee intends
> to make clear that losses caused by the same act may be aggregated
> for purposes of meeting the $1,000 threshold.

*Id.* at 1373-74 (quoting S. Rep. No. 99-474, 99th Cong. 2nd Sess., U.S. Code Cong. & Admin.

News 1986, at p. 2483, Oct. 6, 1986). The district court then concluded as follows:

---

[6] The threshold amount was $1,000 at that time but has since been increased to $5,000. *In re Am. Online, Inc.*, 168 F. Supp. 2d at 1373 n.10.

8

> The legislative history of the CFAA actually contravenes [the defendant] AOL's argument that Congress intended for damage to be measured by only one computer. In fact, the predecessor versions of the CFAA make it clear that damage is to be measured as it stems from one act, not a single computer, and thereby affects several individuals.

*Id.* at 1373; *see also In re Apple*, 596 F. Supp. 2d at 1308 (permitting aggregation of damages to meet the $5,000 threshold because "the legislative history of the CFAA reveal[s] that Congress intended to permit aggregation of damages, so long as those damages arose from the same act by a defendant." (citing *In re Toys R Us, Inc., Privacy Litig.*, No. 00-2746, 2001 WL 34517252, at *1 (N.D. Cal. Oct. 9, 2001) ("*In re Toys R Us*"))). The Court agrees.

Here, Plaintiff claims of damage from a single act: the Update. Compl. ¶ 60. Defendant argues that each acceptance of the Update was a separate act. Def. Reply at 10. The Court disagrees. Damage results from a "single act" when the defendants "caused an identical file to be implanted in each of the plaintiffs' computers, resulting in damages of a uniform nature." *In re Apple*, 596 F. Supp. 2d at 1308 (quoting *In re Toys R Us*, 2001 WL 34517252, at *11). In *In re Apple*, the district court found Apple's software update bricking of "unlocked" iPhones to be a single act sufficient to aggregate claims even though users had to individually agree to install the update. *Id.* The same is true here. Defendant's single act of releasing the Update caused the identical Update to be installed on all Dashes, resulting in uniform damage (bricking) to each Dash. Therefore, Plaintiff plausibly pled a single act sufficient to aggregate claims for purposes of meeting the $5,000 threshold.

Defendant also argues that even if a single act caused the damage, Plaintiff's CFAA claim still fails because Plaintiff must rely on damages to other unnamed putative class members to meet the $5,000 threshold requirement. Def. Br. at 15-16. Defendant cites to *Klein v. Gen. Nutrition Companies, Inc.*, 186 F.3d 338 (3d Cir. 1999), and *Lewis v. Casey*, 518 U.S. 343 (1996), in support.

Def. Br. at 16. However, neither *Klein* nor *Lewis* involved a CFAA claim. Moreover, both cases indicate that a plaintiff himself must suffer damage, in other words, the named plaintiff may not rely *solely* on damage to other unnamed members of the purported class. *See Klein*, 186 F.3d at 345 ("[N]amed plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." (quoting *Lewis*, 518 U.S. at 357)). Here, Plaintiff has sufficiently alleged that he suffered damage when Defendant bricked his Dashes, rendering them nonfunctional. Compl. ¶¶ 37. Plaintiff has plausibly pled that the Update resulted in over $5,000 of uniform damages to Plaintiff and other putative class members. The Court denies Defendant's motion to dismiss as to Plaintiff's CFAA claim (Count I).

## CFA (Count II)

Plaintiff next alleges a violation of New Jersey's CFA. Compl. ¶¶ 61-71. New Jersey's CFA prohibits "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise or real estate." N.J.S.A. 56:8-1. To state a New Jersey CFA claim, a plaintiff must plead with particularity: "(1) an unlawful practice; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the defendant's unlawful conduct and the plaintiff's ascertainable loss." *Mehnert v. U.S. Bank Nat'l Ass'n*, No. 17-4985, 2018 WL 1942523, at *7 (D.N.J. Apr. 23, 2018) (quoting *Dabush v. Mercedes–Benz USA, LLC*, 378 N.J. Super. 105, 114 (App. Div. 2005)). An unlawful practice can fall into three general categories: affirmative acts, knowing omissions, or regulatory violations. *Id.*

Plaintiff alleges (1) an affirmative misrepresentation; and (2) a knowing omission. Compl. ¶¶ 65, 68. As for the affirmative misrepresentation, Plaintiff alleges that Sony represented that the Dash is a "personal application and /or internet viewer which would utilize SONY's dedicated servers to operate and that SONY would stand behind the product for the anticipated useful life of the product." Compl. ¶ 65. Defendant argues that the first part of the clause is not misleading and "not false—the [D]ash was a personal application and/or viewer and it used Sony's servers." Def. Br. at 18. Defendant instead argues that it never represented that Dash users would have access to Sony's servers for a particular period of time. *Id.* at 18-19. Defendant denies that it ever guaranteed access to Sony's servers for a Dash's "useful life." Def. Br. at 18-19. The Court agrees. Plaintiff has not pled with any particularity who made this alleged representation regarding useful life, when the representation was made, or where the representation was made. None of Sony's promotional language included in the Complaint represents that Sony would support the product for its anticipated useful life. Plaintiff fails to plead with particularity the alleged affirmative misrepresentation.

As for a knowing omission, Plaintiff alleges that Sony "did not inform Plaintiff or the members of the Class that it had designed the product so that [Sony] had the ability to brick the product at will," "long before the end of its anticipated and reasonable useful life," because "the advertised function of the SONY Dash was no longer profitable." *Id.* ¶¶ 66-68. Defendant argues that this allegation is conclusory, and Plaintiff has not alleged with particularity facts supporting a knowing omission. Def. Br. at 21-22.

Under the knowing omission theory, a defendant is liable for failing to inform consumers of a known defect in a product. *Glass v. BMW of N. Am., LLC*, No. 10-5259, 2011 WL 6887721, at *8 (D.N.J. Dec. 29, 2011). In *Glass*, the power steering in the plaintiff's MINI Cooper failed.

2011 WL 6887721, at *1. The plaintiff brought a New Jersey CFA claim against BMW of North America, LLC, the manufacturer, for allegedly knowing about the defect and failing to inform consumers. *Id.* at *8. The district court explained that the plaintiff did not specifically allege the following:

> (1) who at BMW NA possessed knowledge of the defect; (2) when or how the decision was made to conceal the defect from customers; (3) that all, or even substantially all, MINI Cooper vehicles have a defective power steering system; and (4) that BMW NA knew that the power steering was certain to fail.

*Id.* The district court accordingly found that the plaintiff failed to plead with particularity her CFA knowing omission claim. *Id.*

A similar conclusion is warranted here. Plaintiff alleges that the "defect" in the Dash is that Sony would "brick the Dash prior to the end of its useful life in the event expected profits were not realized." Compl. ¶ 40(a). Plaintiff further alleges that Sony's "senior vice president of the personal imaging and audio business, Brennan Mullin," knew and "concealed the intention." *Id.* However, Plaintiff's very allegation weighs against his argument. By stating that Sony would shut down the servers "*in the event that profits were not realized*," Plaintiff implicitly admits that Sony (and Mullin) *did not know* whether the Dash would be profitable at the time of the promotional statements cited in the Complaint. In other words, Plaintiff does not allege with particularity that Sony knew the Dash was defective – or "certain to fail" – prior to April 2017, when Sony informed consumers that it would stop supporting the device. If the Dash continued to be profitable (which it appeared to be for a number of years) and Sony continued to support the device, then the Dash would not be defective; it would function exactly as advertised. Given the uncertainty of the Dash's profitability at the time of Defendant's statements, the Court cannot say that Defendant concealed information regarding a known defect in the product. In other words,

Plaintiff has not adequately alleged that Defendant knew when it sold the Dashes that it would be disabling the devices' functionality. And, based on the time lapse between the advertising and sales, when compared with the date of the Update, it is not reasonable to infer that Defendant had such knowledge. Plaintiff fails to plead with particularity a knowing omission.[7] Plaintiff's New Jersey CFA claim (Count II) is dismissed without prejudice.

## Express Warranty (Count III)

Plaintiff next alleges a breach of an express warranty. Compl. ¶¶ 72-86. To state a claim for breach of an express warranty under New Jersey law, a plaintiff must allege "(1) that Defendant made an affirmation, promise or description about the product; (2) that this affirmation, promise or description became part of the basis of the bargain for the product; and (3) that the product ultimately did not conform to the affirmation, promise or description." *Francis E. Parker Mem'l Home, Inc. v. Georgia-Pac. LLC*, 945 F. Supp. 2d 543, 568 (D.N.J. 2013) (citing N.J.S.A. § 12A:2-313). As for guarantees of the future performance of a product, the Supreme Court of New Jersey has recognized the following:

> Of course, the circumstances can be such that the seller will make a warranty as to the future condition or future performance of the article sold, as by guaranteeing the article for a stated period of time. It would seem, however, that such a warranty of future condition or performance must be explicit.

*Herbstman v. Eastman Kodak Co.*, 68 N.J. 1, 12 (1975).

---

[7] The Court notes that Plaintiff would also have to sufficiently allege causation: that Defendant knew that the Dash would fail and omitted this information *at the time Plaintiff purchased his Dashes*, causing Plaintiff to purchase his Dashes at the price he did and suffer a loss. Yet, because the Court finds that Plaintiff did not plead with particularity an unlawful practice, the Court does not reach the causation issue. The Court also does not reach the ascertainable loss issue for the same reason.

Here, Plaintiff does not plausibly plead that Defendant expressly warranted the functionality of the Dash's software for the device's anticipated useful life or for any stated period of time.[8] Instead, Defendant stated in the EULA that it may delete functions that consumers may rely on, Compl. ¶ 27, Ex. A – seemingly negating Plaintiff's argument that Defendant made an express warranty to the contrary. Plaintiff did not plausibly plead breach of an express warranty.[9]

Plaintiff alternatively argues that Defendant's express warranty (or lack thereof) was substantively and procedurally unconscionable. Compl. ¶¶ 83, 84. "It is well-settled that courts 'may refuse to enforce contracts that are unconscionable or violate public policy.'" *Argabright v. Rheem Mfg. Co.*, 201 F. Supp. 3d 578, 595 (D.N.J. 2016) (quoting *Saxon Constr. & Mgmt. Corp. v. Masterclean of N.C., Inc.*, 273 N.J. Super. 231, 236 (App. Div. 1994)). "Unconscionability may be either substantive or procedural." *Id.* Procedural unconscionability "refers to unfairness in the formation of the contract, and may be shown by a variety of inadequacies, such as age, literacy, lack of sophistication, hidden or unduly complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process." *Id.* (quoting M*uhammad v. Cty. Bank of Rehoboth Beach*, 189 N.J. 1, 15 (2006)) (internal quotations omitted). Substantive unconscionability occurs when a contract term is "excessively disproportionate and involves an exchange of obligations so one-sided as to shock the court's conscience." *Id.* (quoting *Delta Funding Corp. v. Harris*, 189 N.J. 28, 55 (2006)) (internal quotations omitted).

First, the Court does not find procedural unconscionability under the allegations of the Complaint. The EULA appears to be a contract of adhesion. "The essential nature of a contract

_____

[8] Plaintiff's Dashes appear to have functioned properly for years. *See* Compl. ¶¶ 30-38.

[9] Plaintiff does not allege that the device's hardware caused injury; therefore, the one-year hardware warranty is inapplicable to this breach of express warranty claim or the related arguments of procedural and substantive unconscionability.

of adhesion is that it is presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity for the adhering party to negotiate except perhaps on a few particulars." *Moore v. Woman To Woman Obstetrics & Gynecology, L.L.C.*, 416 N.J. Super. 30, 38 (App. Div. 2010) (quoting *Rudbart v. N. Jersey Dist. Water Supply Comm'n*, 127 N.J. 344, 353 (1992)). However, contracts of adhesion are not per se procedurally unconscionable. *Id.* Instead, courts are to "us[e] a sliding scale analysis," applying the abovementioned factors. *Id.*

Here, Plaintiff alleges that Sony delivered the EULA to consumers in the Dash's packaging after a consumer already purchased the product, and that the consumer could either accept the terms or return the product. Compl. ¶ 27. This is a contract of adhesion. Yet, Plaintiff appears to be an affluent and sophisticated consumer; he maintained two residences, purchased five Dashes, and engaged in online research of competing products prior making his purchases. Compl. ¶¶ 30-34. Nothing in the Complaint indicates that Plaintiff was of insufficient age or sophistication to appreciate these terms. The conclusory allegation that Sony had superior bargaining power, or the fact that Sony delivered the EULA in the product's packaging, are both insufficient to carry the claim. *See Argabright*, 201 F. Supp. 3d at 596 ("Of course, there is a disparity in bargaining power in nearly all consumer contracts executed between a purchaser and a manufacturer, and Plaintiffs' conclusory assertion is by itself insufficient to render a contract unconscionable."). The Court finds that Plaintiff has not plausibly pled procedural unconscionability.

Similarly, the Court does not find that substantive unconscionability is supported by the Complaint. As explained above, at this stage, the Court does not read the EULA to authorize Defendant to terminate all functionality of the device. A reasonable reading of the EULA allows Defendant to alter certain features as it sees fit, presumably to enhance or improve the consumer's experience. The Court does not find these terms to be excessively disproportionate, or so one-

15

sided as to the shock the conscience. Plaintiff's breach of an express warranty claim (Count III) is dismissed without prejudice.

Implied Warranty (Count IV)

Plaintiff next alleges a breach of implied warranties of merchantability and fitness for a particular purpose. Compl. ¶¶ 87-97. New Jersey law provides for an implied warranty of merchantability and implied warranty of fitness for a particular purpose, *see* N.J.S.A. §§ 12A:2-314 (merchantability), 315 (fitness for a particular purpose), however, "[t]he complete exclusion of implied warranties, including warranties of merchantability and of fitness for a particular purpose, is specifically permitted." *Gladden v. Cadillac Motor Car Div., Gen. Motors Corp.*, 83 N.J. 320, 330-31 (1980) (citing N.J.S.A. § 12A:2-316). To disclaim these warranties, the written "language must be clear and conspicuous." *Id.* (citing N.J.S.A. § 12A:2-316). For example, the disclaimer could say that "[t]here are no warranties which extend beyond the description on the face hereof." N.J.S.A. § 12A:2-316.

Here, Sony stated in its limited warranty that "ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE ON THIS PRODUCT IS LIMITED IN DURATION TO THE DURATION OF THIS WARRANTY." D.E. 15-5. Elsewhere in the limited warranty, Sony set the duration of the warranty for "a period of one (1) year from the original purchase of the product." *Id.* Thus, Sony conspicuously limited its implied warranties to one-year. Plaintiff has not alleged that the bricking occurred within one year of his purchase of a Dash. Therefore, Plaintiff fails to plausibly allege a breach of implied warranties. Plaintiff's breach of implied warranties claim (Count IV) is dismissed without prejudice.

## MMWA (Count V)

Plaintiff next alleges a violation of the MMWA. Compl. ¶¶ 98-108. "The MMWA provides a private right of action in federal court for consumers who are 'damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation ... under a written warranty, [or] implied warranty.'" *Guardavacarro v. Home Depot*, No. 16-8796, 2017 WL 3393812, at *9 (D.N.J. Aug. 8, 2017) (quoting 15 U.S.C. § 2310(d)(1)). "MMWA claims are coextensive with underlying state law breach of warranty claims and are therefore, dependent on, and derivative of, said state claims for survival in a motion to dismiss." *Id.* (citing *Cooper v. Samsung Elecs. Am., Inc.*, 374 Fed. Appx. 250, 254 (3d Cir. 2010)); *see also Volin v. Gen. Elec. Co.*, 189 F. Supp. 3d 411, 421-22 (D.N.J. 2016), *as amended* (May 31, 2016) ("Thus, this [MMWA] claim will go forward to the extent that the breach of warranty claims remain viable."). Here, the Court dismissed Plaintiff's state law express and implied warranty claims, therefore the Court also dismisses Plaintiff's MMWA claim (Count V) without prejudice.

## TCCWNA (Count VI)

Plaintiff next alleges a violation of TCCWNA. Compl. ¶¶ 109-17. TCCWNA provides as follows:

> No seller, lessor, creditor, lender or bailee shall in the course of his business offer to any consumer or prospective consumer or enter into any written consumer contract or give or display any written consumer warranty, notice or sign after the effective date of this act which includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller, lessor, creditor, lender or bailee as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed.

*Spade v. Select Comfort Corp.*, 232 N.J. 504, 516 (2018) (quoting N.J.S.A. 56:12-15). In other words, plaintiff must establish that (1) the plaintiff is a consumer, (2) the defendant is a seller, (3)

they entered into a contract, and (4) the contract violates a state or federal law. *Id.*; *see also Watkins v. DineEquity, Inc.*, 591 F. App'x 132, 135 (3d Cir. 2014). "TCCWNA does not establish consumer rights or seller responsibilities," instead, it "bolsters rights and responsibilities established by other laws." *Watkins*, 591 F. App'x at 134. "The rights and responsibilities to be enforced by TCCWNA are drawn from other legislation." *Id.*

Here, Plaintiff draws its TCCWNA claim from Defendant's alleged CFA violation. Compl. ¶¶ 114, 116. The Court has dismissed Plaintiff's CFA claim, therefore the TCCWNA claim based on the alleged CFA violation also fails. *See Wilson v. Kia Motors Am., Inc.*, No. 13-1069, 2015 WL 3903540, at *5 (D.N.J. June 25, 2015) ("Plaintiff cannot establish a violation of a 'clearly established legal right' under the CFA and therefore cannot, by proxy, establish a violation of the TCCWNA.").

Plaintiff also seems to base his TCCWNA claim on a violation of "[w]ell established New Jersey decisional law [that] holds that exculpatory provisions which purport to release businesses from liability for their own negligent, willful, or intentional conduct are unenforceable." Compl. ¶ 116 (citing *Martinez-Santiago v. Public Storage*, 38 F. Supp. 3d 500 (D.N.J. 2014)). Plaintiff quotes a portion of the EULA which limits Sony's liability, but then also quotes a portion of the EULA that makes the limitations applicable only in the jurisdictions that allow them. Compl. ¶ 115. Therefore, any limitations in the EULA will not apply if New Jersey does not allow them. Plaintiff has not plausibly pled a violation of this "[w]ell established New Jersey decisional law" for purposes of maintaining his TCCWNA claim. The Court dismisses Plaintiff's TCCWNA claim (Count VI) without prejudice.

Trespass to Chattel (Count VII)

Plaintiff next alleges trespass to his chattel. Compl. ¶¶ 118-121. Under New Jersey law, "[a] cognizable claim for trespass occurs 'when personal property, in the actual use of the owner, is injured or taken by a trespasser, so that the owner is deprived of the use of it.'" *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 312 (D.N.J. 2009) (quoting *Luse v. Jones*, 39 N.J.L. 707, 709 (N.J. 1877)). "[P]hysical contact with the chattel, for instance, where a person kicks another's car bumper, is not required." *Id.* "All that is required . . . is interference with the chattel as a direct or indirect result of an act done by the actor." *Id.*

Here, on July 12, 2017, Sony released the, in effect, mandatory Update that bricked Plaintiff's Dash. Compl. ¶¶ 120. Contrary to Sony's assertions, Def. Br. at 43, Plaintiff did not consent to Sony rendering his device wholly nonfunctional by agreeing to the EULA, as discussed above. Sony also argues that Plaintiff never owned the software used by the Dash (pursuant to the EULA) and therefore Sony cannot be liable for altering that software in the Update. Def. Br. at 42. Regardless of whether Plaintiff owned the software, Sony, at a minimum, indirectly injured Plaintiff's physical Dash by rendering it completely nonfunctional through the Update. *See In re Apple*, 596 F. Supp. 2d at 1307 (finding that the plaintiffs plausibly pled trespass to chattel by alleging that the defendant, Apple, released a software update that rendered the plaintiffs' iPhones permanently inoperable); *Miguel v. HP Inc.*, 317 F. Supp. 3d at 1088 (finding that the plaintiffs plausibly pled trespass to chattel by alleging that the defendant, HP, released a firmware update that disabled the functionality of the plaintiffs' printers).[10] Plaintiff plausibly pled his trespass to chattel claim and the Court denies Defendant's motion to dismiss as to this claim (Count VII).

---

[10] The Court recognizes that both of these cases applied California trespass law but notes that New Jersey and California common law are similar regarding trespass to chattel.

Unjust Enrichment (Count VIII)

Finally, Plaintiff alleges unjust enrichment. Compl. ¶¶ 122-127. "To establish a claim for unjust enrichment under New Jersey law, a plaintiff must allege 'both that defendant received a benefit and that retention of that benefit without payment would be unjust.'" *Adamson v. Ortho-McNeil Pharm., Inc.*, 463 F. Supp. 2d 496, 505 (D.N.J. 2006) (quoting *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994)). However, "[r]estitution for unjust enrichment is an equitable remedy, available only when there is no adequate remedy at law." *Id.* Additionally, "[u]nder New Jersey law, an indirect purchaser cannot succeed on a claim for unjust enrichment." *Spera v. Samsung Elecs. Am., Inc.*, No. 12-05412, 2014 WL 1334256, at *9 (D.N.J. Apr. 2, 2014) (quoting *Weske v. Samsung Elecs. Am., Inc.*, No. 10-4811, 2012 WL 833003, at *7 (D.N.J. Mar. 12, 2012)). "When an individual purchase a consumer product from a third-party store and not the manufacturer, the purchaser has not conferred a benefit directly to the manufacturer such that the manufacturer could be found to have been unjustly enriched." *Id.* (quoting *Weske*, 2012 WL 833003, at *7). Here, Plaintiff has not alleged that he purchased any of his Dashes directly from Sony. Therefore, he cannot maintain an unjust enrichment claim against Sony. The Court dismisses Plaintiff's unjust enrichment claim (Count VIII) without prejudice.

## IV.    CONCLUSION

In sum, the Court denies in part and grants in part Defendant's motion to dismiss Plaintiff's Complaint (D.E. 15).   The Court denies Defendant's motion to dismiss as to Counts I and VII. Counts II, III, IV, V, VI, and VIII are dismissed without prejudice.   Plaintiff has thirty (30) days to file an amended complaint as to the counts dismissed without prejudice, if he so chooses, consistent with this Opinion.   If Plaintiff fails to file an amended complaint, the dismissal as to these counts will be with prejudice.   An appropriate Order accompanies this Opinion.

Dated: April 30, 2019

_____
John Michael Vazquez, U.S.D.J.
